UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

```
_____
                               )
ISABEL S. COHEN, on Behalf of  )
Herself and All Others         )
Similarly Situated,            )
                               )
         Plaintiff,            )
                               )        C.A. 09-153 S
    v.                         )
                               )
RHODE ISLAND TURNPIKE AND      )
BRIDGE AUTHORITY,              )
                               )
         Defendant.            )
_____)
```

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

This is a class action challenging the constitutionality of the toll schedule for crossing the Newport/Claiborne Pell Bridge ("Newport Bridge"). The case is before the Court on the parties' cross-motions for summary judgment. For the reasons set forth below, Defendant's motion is granted and Plaintiff's motion is denied.

I.    BACKGROUND[1]

Newport, located on Aquidneck Island, is one of Rhode Island's most attractive tourist destinations. It is

---

[1] The facts recited in this section are taken from the parties' Joint Statement of Undisputed Facts, which is appended to this opinion.

visited by thousands of Rhode Island residents and nonresidents alike for both work and play. The Newport Bridge is one of three bridges that drivers may use to access Aquidneck Island. The other two are the Mount Hope Bridge and the Sakonnet River Bridge. Only the Newport Bridge takes drivers directly into the City of Newport; the other bridges bring drivers to the other end of the island, which must be traversed before reaching Newport.

Defendant Rhode Island Turnpike and Bridge Authority ("RITBA") is a state entity charged with maintaining and operating the Newport and Mount Hope Bridges. Drivers cross the Mount Hope Bridge for free but must pay a toll to cross the Newport Bridge. All of RITBA's funds come from the tolls it collects at the Newport Bridge. RITBA uses all these funds to operate and maintain the Newport and Mount Hope Bridges, and to satisfy debt service. Formerly, those crossing the Newport Bridge could pay the toll by cash or token. In either event, the cost for crossing the Bridge was the same for Rhode Island residents and nonresidents. This situation changed in January 2009, when RITBA scrapped the use of tokens and promulgated a toll schedule reflecting a discount for Rhode Island residents that is not available to nonresidents. The discount applies to users of E-ZPass, an electronic toll system that

automatically charges drivers who attach a small electronic device known as a transponder to their car. The new schedule is as follows:[2]

|  | RI transponder | Non-RI transponder |
|---|---|---|
| RI resident | $0.83 | $4.00 |
| RI nonresident | $4.00 | $4.00 |
| RI nonresident making 6+ trips per 30-day period | $0.91 | $4.00 |
| Cash | $4.00 | $4.00 |
| Unlimited Crossing | $40.00 every 30 days | Unavailable |

Plaintiff Isabel S. Cohen is a Connecticut resident who has crossed the Newport Bridge "for many reasons, including to purchase items while in Newport," and has paid tolls at the nonresident rate. (Joint Statement of Undisputed Facts ¶ 2, ECF No. 29.) She has now brought suit--as the representative of the certified class of "all non-Rhode Island residents who paid tolls to cross the Newport/Claiborne Pell Bridge using an E-ZPass, FastLane or other comparable system, and who did not receive the discount given to Rhode Island residents pursuant to the RI

---

[2] Since January 2009, three different toll schedules have been in place, all of them preserving the resident-only discount. Because the parties do not attach any importance (except for the purpose of calculating damages) to the differences among these toll schedules, this opinion will set forth only the most recent schedule. All three schedules can be viewed in the Appendix.

E-ZPass Discount Plan" (id. ¶ 23)--challenging the constitutionality of the toll schedule.

As the chart makes apparent, the current toll schedule reflects at least four forms of differentiation--between: (1) Rhode Island residents and nonresidents; (2) users of Rhode Island and non-Rhode Island transponders; (3) cash payers and E-ZPass users; and (4) frequent and infrequent users. This class action challenges only the first disparity, claiming that the favorable treatment afforded to Rhode Island residents violates the Commerce Clause, the Privileges and Immunities Clause, and the Equal Protection Clause of the United States Constitution.[3]

## II. DISCUSSION

### A. Commerce Clause

The Commerce Clause provides, in pertinent part, "Congress shall have Power . . . [t]o regulate Commerce . . . among the several States . . . ." U.S. Const. art. I, § 8, cl. 3. "Though phrased as a grant of regulatory power to Congress, the Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the

---

[3] The difference between Rhode Island and non-Rhode Island transponders is not challenged because Rhode Island transponders are available to everyone, including nonresidents.

interstate flow of articles of commerce." Oregon Waste Sys., Inc. v. Dep't of Envt'l Quality, 511 U.S. 93, 98 (1994). "This 'dormant' Commerce Clause 'prohibits economic protectionism--that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" Doran v. Mass. Turnpike Auth., 348 F.3d 315, 318 (1st Cir. 2003) (quoting New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 273 (1988)). Plaintiff's first claim for relief is that the resident-only discount violates the dormant Commerce Clause by discriminating against nonresidents of Rhode Island.

   1.  The Market Participant Doctrine

  RITBA argues that the resident-only discount is immune from Commerce Clause scrutiny because, in implementing it, RITBA acts as a "market participant" and not in a governmental capacity. The market participant doctrine "differentiates between a State's acting in its distinctive governmental capacity, and a State's acting in the more general capacity of a market participant; only the former is subject to the limitations of the negative Commerce Clause." New Energy, 486 U.S. at 277. For example, the Supreme Court has held that a state's decision to sell the cement produced at a state-operated cement plant only to state residents did not violate the Commerce Clause,

because the state was acting as a market participant in the private business of producing and selling cement, and had the right to choose with whom it would deal. <u>Reeves, Inc. v. Stake</u>, 447 U.S. 429, 438-40 (1980). As the Second Circuit has observed, there is no bright line separating actions taken in a "governmental capacity" from those taken as a "market participant," and a court faced with a market participant defense "must make fact-specific inquiries on a case-by-case basis" to determine on which side of the line the state action falls. <u>Selevan v. N.Y. Thruway Auth.</u>, 584 F.3d 82, 93 (2d Cir. 2009).

RITBA's market participant argument relies on <u>Endsley v. Chicago</u>, 230 F.3d 276, 284-86 (7th Cir. 2000), which held that the actions of the City of Chicago in collecting tolls for crossing the Chicago Skyway were shielded from Commerce Clause scrutiny by the market participant doctrine. This Court is not persuaded by the attempted analogy to <u>Endsley</u>. To begin with, in that case, the Seventh Circuit noted that the plaintiffs "plead[ed] themselves out of court" by alleging in their complaint that "[s]ince its inception, the City has operated the Skyway as a proprietary enterprise, and not in its governmental capacity." <u>Id.</u> at 284. Here, by contrast, Cohen has not shot her own Commerce Clause claim in the

heart by including such a self-defeating allegation in the complaint.

But the analysis does not stop there, because the Seventh Circuit went on in Endsley to conclude that the market participant doctrine would shield Chicago's operation of the Skyway from Commerce Clause scrutiny "[e]ven if plaintiffs had not plead themselves out of court." Id. The court reasoned that in raising funds for the upkeep and operation of the Skyway by selling revenue bonds and charging drivers a toll, "the City was acting as a property owner, using its property to raise money, not as a regulator." Id. at 285. RITBA relies on the same logic, arguing that in charging tolls for crossing the Newport Bridge, which it owns and operates, it is acting like a private property owner.

The market participant doctrine is not as open-ended as RITBA would have the Court believe. It only "permits a State to influence 'a discrete, identifiable class of economic activity in which [it] is a major participant.'" South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 97 (1984) (brackets in original) (quoting White v. Mass. Council of Constr. Emp'rs, Inc., 460 U.S. 204, 211 n.7 (1983)). And the "market" must be "relatively narrowly defined," lest the market participant doctrine "swallow[]

up the rule that States may not impose substantial burdens on interstate commerce . . . ." South-Central Timber, 467 U.S. at 97-98. Here, RITBA has not identified such a market, and has not pointed out how it participates in it and with whom it competes.

Nor is the bare assertion that "[c]ourts have recognized the operation of private toll roads as legitimate economic activity," Endsley, 230 F.3d at 284, sufficient to meet the Supreme Court's requirement of identifying a narrowly-defined market. That requirement mandates the identification of an economic market in which the state actually participates in conducting the challenged activity, South-Central Timber, 467 U.S. at 97-98, not the mere assertion that the state's conduct could be conceived of in the abstract as "legitimate economic activity," Endsley, 230 F.3d at 284. If such a hypothetical exercise were sufficient, the market participant doctrine would sweep endlessly, encompassing every conceivable state function and "swallowing up" the negative command of the dormant Commerce Clause. For example, no one could seriously suggest that just because providing security services can constitute "legitimate economic activity," a state acts as a market participant when it provides for the security of its citizens; quite

the contrary, maintaining public security has long been regarded as a core governmental function. See, e.g., Illinois v. Gates, 462 U.S. 213, 237 (1983) (referring to the duty "to provide for the security of the individual and of his property" as "the most basic function of any government") (internal citations and quotation marks omitted); Branzburg v. Hayes, 408 U.S. 665, 690 (1972) ("providing security for the person and property of the individual is a fundamental function of government"). Similarly, the mere fact that private property owners may charge fees for the use of their property does not transform RITBA's operation of Rhode Island State bridges and tollways into private market activity.[4]

In view of these considerations, it is not surprising that other courts confronted with the issue in a similar context have declined to follow the Endsley court's sweeping interpretation of the market participant doctrine. See Selevan, 584 F.3d at 93-94 (refusing to follow Endsley and holding instead that the market participant doctrine

---

[4] Indeed, the decisions cited in Endsley for the proposition that "[c]ourts have recognized the operation of private toll roads as legitimate economic activity," 230 F.3d at 284, have nothing to do with the market participant doctrine. See Overstreet v. North Shore Corp., 318 U.S. 125 (1943); Moore Bros. Co. v. Brown & Root, Inc., 207 F.3d 717 (4th Cir. 2000) (cited by the Endsley court as Lane Constr. Corp. v. Highlands Ins. Co.).

did not immunize the New York Thruway Authority from Commerce Clause scrutiny when it implemented a bridge toll discount available exclusively to residents of Grand Island, New York); Surprenant v. Mass. Turnpike Auth., No. 09-10428, 2010 WL 785306, at *6 n.9 (D. Mass. Mar. 4, 2010) (holding that the market participant doctrine did not apply to the Massachusetts Turnpike Authority's implementation of a toll discount program).[5] Like the statutes at work in Selevan and Surprenant, RITBA's enabling act makes clear that "the acquisition, construction, operation, and maintenance by the authority of the projects as defined in this chapter as [sic] will constitute the performance of essential governmental functions . . . ." R.I.G.L. § 24-12-31.

Given the clear language of RITBA's enabling act, the general rule that "building and maintaining roads is a core governmental function," Selevan, 584 F.3d at 93, and RITBA's failure to identify a narrowly-defined market in which it is a "major participant," South-Central Timber, 467 U.S. at 97-98, the Court concludes that the market

---

[5] The First Circuit has not ruled on the issue. See Doran v. Mass. Turnpike Auth., 348 F.3d 315, 318 n.2 (1st Cir. 2003) (declining to reach the issue whether the Massachusetts Turnpike Authority's implementation of a toll discount program was protected by the market participant doctrine).

participant doctrine does not shield RITBA's implementation of the toll schedule from Commerce Clause scrutiny. Plaintiff's dormant Commerce Clause claim must thus be assessed on the merits.

## 2. The Merits

The application of the dormant Commerce Clause to this class action must follow the framework erected by the Supreme Court in Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc., 405 U.S. 707 (1972), and Northwest Airlines, Inc. v. County of Kent, Mich., 510 U.S. 355 (1994). In Evansville the Court held that a charge levied by state entities on commercial airliners to help defray the costs of airport construction and maintenance is constitutional "so long as the toll is based on some fair approximation of use or privilege for use . . . and is neither discriminatory against interstate commerce nor excessive in comparison with the governmental benefit conferred, . . . even though some other formula might reflect more exactly the relative use of the state facilities by individual users." 405 U.S. at 716-17. In Northwest Airlines the Court reformulated the Evansville rule as a three-pronged test: "a levy is reasonable under Evansville if it (1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to

the benefits conferred, and (3) does not discriminate against interstate commerce." Northwest Airlines, 510 U.S. at 369 (citing Evansville, 405 U.S. at 716-17).

Though the Northwest Airlines test was first announced in connection with the "reasonableness" requirement of the Anti-Head Tax Act, the Supreme Court affirmed that it is "taken directly from our dormant Commerce Clause jurisprudence" and applied it to a dormant Commerce Clause challenge. Northwest Airlines, 510 U.S. at 373-74. Accordingly, the First Circuit has applied the same test in adjudicating a dormant Commerce Clause challenge to bridge and highway tolls. Doran, 348 F.3d at 320 (citing Evansville); see also Selevan, 584 F.3d at 97-98 (citing with approval the First Circuit's application of "the Evansville / Northwest Airlines test" and holding that the same test applies to a dormant Commerce Clause challenge to a bridge toll).[6]

---

[6] In view of the First Circuit's application of the Evansville / Northwest Airlines test to a Commerce Clause challenge to a toll discount in Doran, this Court is not free to apply any other test to this case. However, it must be noted that state and federal courts in Massachusetts have applied alternative tests in assessing similar challenges to the constitutionality of highway tolls. See Kelen v. Mass. Turnpike Auth., No. 060839BLS1, 2007 WL 1418510, at *6 (Mass. Super. Ct. May 3, 2007) (invoking various decisions and apparently applying the test of Pike v. Bruce Church, Inc., 397 U.S. 137 (1970)); Surprenant v. Mass. Turnpike Auth., No. 09-10428, 2010 WL

Because the presence of discrimination would swiftly
dispose of the case, the Court addresses the third prong of

---

785306, at *6 (D. Mass. Mar. 4, 2010) ("I believe that the
Second Circuit was wrong in mandating the application of
the Northwest Airlines test, and that the Pike test applied
[in Kelen] is the correct one."). The refusal to apply
Northwest Airlines in Kelen and Surprenant appears to have
been based on the argument that the tolls at issue did not
have a sufficient impact on interstate commerce to even
invoke Commerce Clause scrutiny, an argument repeated by
RITBA in this case. See Kelen, 2007 WL 1418510, at *7
(concluding that because the toll gates were situated
within the state, not close to the borders, and the toll
program did not show economic protectionism, "the tolls do
not have sufficient facial effect on interstate commerce to
evoke commerce clause scrutiny"); Surprenant, 2010 WL
785306, at *4-6 (quoting the Kelen analysis with approval).
This line of reasoning seems mistaken, because Supreme
Court precedent clearly establishes that the degree of an
alleged violation, no matter how minimal, does not preclude
scrutiny under the Commerce Clause. Oregon Waste Sys.,
Inc. v. Dep't of Envtl. Quality, 511 U.S. 93, 100 n.4
(1994) ("our precedents . . . clearly establish that the
degree of a differential burden or charge on interstate
commerce measures only the extent of the discrimination and
is of no relevance to the determination whether a State has
discriminated against interstate commerce") (internal
citations and quotation marks omitted) (emphasis in
original); see also Selevan v. N.Y. Thruway Auth., 584 F.3d
82, 92 (2d Cir. 2009) (relying on Oregon Waste to reject
the argument that a 75-cent toll for crossing an intrastate
bridge in New York "did not impose any cognizable burden on
interstate commerce," and holding that the "toll
differential [between residents and nonresidents] speaks to
the extent of the alleged discrimination, rather than to
the presence of a violation"). Indeed, the tollways at
issue in Doran were located intrastate (around Boston) and
not near state borders, but that did not prevent the First
Circuit from undertaking a Commerce Clause analysis and
applying Evansville / Northwest Airlines. In any event, in
light of this Court's application of Northwest Airlines
(infra at 13-23), the different approaches taken by this
Court and the courts in Kelen and Surprenant may amount to
different paths to the same conclusion.

Northwest Airlines first. See Selevan, 584 F.3d at 94 (characterizing the discrimination prong as a "threshold inquiry" and addressing it first). Plaintiff contends that because RITBA treats Rhode Island residents and nonresidents differently by making its toll discount available only to residents, it discriminates against interstate commerce. In other words, according to RITBA, differentiation equals discrimination. Superficially, there appears to be some support for this position. See Oregon Waste, 511 U.S. at 99 ("'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter").

On closer inspection, however, the analogy to Oregon Waste falls apart. That decision spoke to "differential treatment of in-state and out-of-state economic interests" --that is, transporters of in-state and out-of-state waste --not differential treatment of residents and nonresidents. See id. (emphasis added) (deeming it "obvious" that a surcharge imposed by Oregon on disposal of waste generated out of state was facially discriminatory because it did not apply to in-state waste). Indeed, although there is no dearth of jurisprudence on Commerce Clause challenges to bridge and highway tolls, not a single one of the decisions

cited by the parties has held that such tolls discriminate against interstate commerce solely because they differentiate between residents and nonresidents. This shows that the logic of "differentiation equals discrimination" does not apply to different tolls charged to resident and nonresident motorists.[7]

There is good reason for this forbearance: "The central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent." C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 390 (1994). Accordingly, when a law does not implicate the kind of "local economic protectionism" that the Commerce Clause aims to eradicate,

---

[7] The fact that other state programs favoring residents over nonresidents have been upheld as constitutional lends additional support to the conclusion that the "differentiation equals discrimination" logic does not always apply in a non-economic context. See, e.g., Baldwin v. Fish & Game Comm'n of Mont., 436 U.S. 371 (1978) (upholding a Montana statute that made it more difficult and expensive for nonresidents to obtain hunting licenses); Martinez v. Bynum, 461 U.S. 321, 333 (1983) ("The Constitution permits a State to restrict eligibility for tuition-free education to its bona fide residents."); Vlandis v. Kline, 412 U.S. 441, 452-53 (1973) ("We fully recognize that a State has a legitimate interest in protecting and preserving the quality of its colleges and universities and the right of its own bona fide residents to attend such institutions on a preferential tuition basis.").

the rationale for equating differentiation and discrimination disappears. In applying C & A Carbone to Commerce Clause challenges to bridge tolls, the Second Circuit has held, "in order to state a claim for discrimination in violation of the Commerce Clause, a plaintiff must identify an in-state commercial interest that is favored, directly or indirectly, by the challenged statutes at the expense of out-of-state competitors." Selevan, 584 F.3d at 95 (internal citations, quotation marks, and brackets omitted).[8]

Selevan involved a constitutional challenge to a bridge toll discount available only to residents of Grand Island, New York. The Second Circuit held that the plaintiffs could not demonstrate discrimination within the meaning of Northwest Airlines because they "failed to identify an in-state commercial interest that is favored, and they do not point to a particular out-of-state competitor that is harmed by NYTA's toll policy." Id. (internal citations, quotation marks, and brackets omitted).

---

[8] In Doran, the First Circuit had no occasion to decide whether differentiation equals discrimination in the context of tolls, because the toll discount challenged there did not differentiate between residents and nonresidents of Massachusetts, and was available to both. 348 F.3d at 319.

As in Selevan, in this case Plaintiff has failed to identify a specific in-state commercial interest that is favored by the Newport Bridge toll discount at the expense of particular out-of-state competitors, so it cannot demonstrate that the discount discriminates against interstate commerce. Therefore, the discount satisfies the third prong of Northwest Airlines.

Turning now to the first two prongs, the Court must decide whether the Newport Bridge toll "(1) is based on some fair approximation of use of the facilities" and "(2) is not excessive in relation to the benefits conferred." Northwest Airlines, 510 U.S. at 369. Because these two prongs are related, the Court will address them together (as the parties have done). See Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth., 567 F.3d 79, 86 (2d Cir. 2009) (noting that "the 'fair approximation' and the 'excessiveness' criteria substantially overlap" and addressing them together).

Cohen argues that because RITBA uses some of the toll moneys collected at the Newport Bridge to maintain the non-tolled Mount Hope Bridge, the toll is not based on a fair approximation of the use of the Newport Bridge and is excessive in relation to the benefits conferred by it. In other words, according to Cohen, the fact that the tolls

collected at the Newport Bridge are used to maintain and operate another facility shows that the toll amount exceeds the costs and benefits associated with the Newport Bridge itself. This argument relies on Bridgeport, which held that a fee imposed by a quasi-public authority of the State of Connecticut on the passengers of a ferry company transporting travelers from ports in Connecticut to New York violated the dormant Commerce Clause, because the fees were used to fund many activities that were not available to and did not benefit the ferry passengers. Id. at 87-88.

RITBA counters that the Mount Hope Bridge does benefit the users of the Newport Bridge, so the fact that part of the Newport Bridge toll moneys go towards maintaining the Mount Hope Bridge does not mean that the tolls are excessive. Specifically, RITBA relies on Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J., 887 F.2d 417 (2d Cir. 1989), to argue that there is a "functional relationship" between the Newport and Mount Hope Bridges. In that case, plaintiffs challenged the Port Authority of New York and New Jersey's subsidization of the Port Authority Trans-Hudson Railroad ("PATH") by including PATH in the rate base for the tolls charged to cars crossing various bridges and tunnels in the area. Id. at 417. The Second Circuit held that including PATH in the rate base

18

was appropriate because there was a functional relationship between PATH and the bridges and tunnels. Specifically, PATH prevented a "spillover effect" by diverting some of the traffic that would jam the bridges and tunnels in the absence of PATH. Id. at 422-23.[9]

Cohen disputes the analogy to Auto. Club. She argues that there can be no functional relationship between the two bridges, for if there were, "then everyone would take the free crossing and no one would pay the $4.00 Newport Pell Bridge toll." (Pl.'s Rep. Mem. at 5.) This argument confuses the concept of exact interchangeability with functional relationship. As previously mentioned (supra at 2), the Newport Bridge and the Mount Hope Bridge do not take drivers to exactly the same place, which explains why some drivers might prefer to take the former over the latter despite its cost. However, it is possible for the two bridges to be functionally related without operating as exact substitutes. This was indeed the case in Auto. Club,

---

[9] Auto. Club involved a challenge under the Federal-Aid Highway Act of 1987, and the plaintiffs had abandoned their Commerce Clause claim by the time the case reached the Second Circuit. Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J., 887 F.2d 417, 417, 420 n.2 (2d Cir. 1989). However, the parties in this case do not dispute the applicability of the "functional relationship" analysis to the dormant Commerce Clause claim, and the Second Circuit has elsewhere indicated that the test is relevant in this context. See Bridgeport, 567 F.3d at 87.

where although some of the bridges and tunnels did not have the identical origin and destination as the PATH railway, the Second Circuit held that the routes were functionally related because the bridges and tunnels would become overcrowded in the absence of PATH. 887 F.2d at 422-23. The Second Circuit held that in assessing a purported functional relationship, a court should not focus narrowly on an "origin and destination" analysis and must also pay attention to a possible "spillover effect." Id. at 422.

Applying the spillover effect analysis to this case, the question is whether the presence of the Mount Hope Bridge helps alleviate the traffic that would exist on the Newport Bridge in its absence. In other words, would "closing [the Mount Hope Bridge] increase[] congestion" on the Newport Bridge? See id. at 423. Given that the Newport and Mount Hope Bridges comprise two of only three routes of driver access to Aquidneck Island, this question must be answered in the affirmative. If the Mount Hope Bridge were closed, drivers who now use it to get to Aquidneck Island would have to choose either the Newport Bridge or the Sakonnet River Bridge instead. In either event, increased congestion on the Newport Bridge is unavoidable: If they take the Newport Bridge, congestion on the Newport Bridge would increase. If they take the

Sakonnet River Bridge, congestion on that bridge would increase, prompting some of its previous users to take the Newport Bridge instead, which would again increase congestion on the Newport Bridge. In short, given that Aquidneck Island is in fact an island with only three avenues of access for drivers, the conclusion that two of these three avenues are functionally related follows almost by definition.

This Court is not required to measure the strength of this functional relationship or the precise extent of added congestion that closing the Mount Hope Bridge would produce. Plaintiff's argument, relying on <u>Bridgeport</u>, is that because the Mount Hope Bridge does not benefit users of the Newport Bridge at all, the fact that the Newport Bridge tolls subsidize the Mount Hope Bridge is, by itself, sufficient to show that the toll schedule flunks the first two prongs of <u>Northwest Airlines</u>. To defeat this argument, all that must be shown is some functional relationship between the two bridges.

Nor has Plaintiff adduced any other evidence to show that the Newport Bridge tolls are not "based on some fair approximation of use of the facilities" or are "excessive in relation to the benefits conferred." <u>See</u> <u>Northwest Airlines</u>, 510 U.S. at 369. All that Plaintiff offers on

this score is that the tolls must be excessive because they are different for nonresidents. "Obviously," says Plaintiff, "the actual cost of a passenger car to cross the Newport Pell Bridge would not fluctuate from 83 cents to $4.00 simply because the driver's residency changed from Rhode Island to another state." (Pl.'s Amended Mem. at 13.)

Once again, a point decried as "obvious" is a weak link. To begin with, the $0.83 versus $4.00 differential applies only to infrequent crossers; if a nonresident makes more than six trips a month, his E-ZPass toll is only eight cents higher than a resident's, and the E-ZPass tolls for unlimited crossings, as well as the cash tolls, are the same for residents and nonresidents. See supra at 3. Therefore, this is not a case where a state generally charges its residents $0.83 and its nonresidents $4.00 for a bridge toll. The toll schedule incorporates multiple factors besides residency--including the type of transponder used, whether payment is by cash or by E-ZPass, and the frequency of use. Depending on all these factors, the toll difference between similarly situated residents and nonresidents can range from zero to $3.17.

Moreover, RITBA need not demonstrate that the toll fee exactly equals the costs of maintenance or the benefits

conferred; all that is required is that the tolls "reflect a fair, if imperfect, approximation of the use of facilities for whose benefit they are imposed." Evansville, 405 U.S. at 717. The Supreme Court has rejected a requirement of "complete fairness," noting that the factors to be considered in applying such a perfectionist standard "are so countless that we must be content with rough approximation rather than precision." Id. at 716 (internal quotation marks and citations omitted).

Because this Court has held that the toll discount does not discriminate against interstate commerce, see supra at 15, the differentiation between residents and nonresidents is subject to deferential review. See Oregon Waste, 511 U.S. at 99 ("nondiscriminatory regulations . . . are valid unless 'the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits'") (quoting Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970)).[10]  Here, Plaintiff has proffered no

_____

[10] It would be a different matter if Plaintiff had shown that the differentiation between residents and nonresidents amounts to discrimination against interstate commerce.  If that were the case (which it is not), the discount would be subjected to strict scrutiny, which it might not survive. See Oregon Waste, 511 U.S. at 101 (holding that a discriminatory measure is subject to "the strictest scrutiny," a burden "so heavy that facial discrimination by

23

evidence of a "clearly excessive" burden, claiming instead that the toll discount must "obviously" be excessive by mere dint of the fact that it is higher for nonresidents. RITBA's purported justification for this differentiation-- namely, that imposing a higher toll on nonresident users is justified because it would be more expensive to apprehend them and make them pay if they shirk from paying the toll or damage the toll structure--is sufficient to rebut Plaintiff's conclusory assertion. Like the charges upheld in Evansville, the toll discounts in this case "reflect rational distinctions among different classes of" motorists, and are not "wholly unreasonable" nor "wholly irrational." See 405 U.S. at 718-19.

In sum, the Newport Bridge toll schedule passes muster under Northwest Airlines because (1) it is based on a fair approximation of use of the facilities operated by RITBA; (2) it is not excessive in relation to the benefits conferred; and (3) it does not discriminate against interstate commerce. Therefore, the toll discount does not run afoul of the Commerce Clause.[11]

---

itself may be a fatal defect") (internal quotation marks and citations omitted).

[11] Two other courts assessing a similar challenge also concluded, albeit after applying a different test than Northwest Airlines, that a toll discount available only to residents of East Boston, South Boston, and the North End

24

B.  Privileges and Immunities Clause

The Privileges and Immunities Clause provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."  U.S. Const. art. IV, § 2, cl. 1.  It "was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy."  <u>Toomer v. Witsell</u>, 334 U.S. 385, 395 (1948).  The Supreme Court has established a two-step inquiry for assessing claims under the Privileges and Immunities Clause:  First, the court must determine whether the alleged discrimination bears upon a "fundamental" right--that is, one of "those 'privileges' and 'immunities' bearing upon the vitality of the Nation as a single entity."  <u>United Bldg. & Constr. Trades Council v. Mayor of Camden</u>, 465 U.S. 208, 218 (1984) (internal quotation marks omitted) (quoting <u>Baldwin v. Fish & Game Comm'n of Mont.</u>, 436 U.S. 371, 383 (1978)).  If no fundamental right is implicated, the Privileges and Immunities Clause does not require equal treatment of residents and nonresidents, and the challenged state action does not "fall within the purview of the Privileges and Immunities Clause."  <u>Id.</u>

in Boston did not discriminate against interstate commerce. <u>See</u> <u>Kelen</u>, 2007 WL 1418510, at *7; <u>Surprenant</u>, 2010 WL 785306, at *4; <u>see also</u> <u>supra</u> note 6.

(quoting Baldwin, 436 U.S. at 388). But if the discrimination goes to a fundamental right, it is unconstitutional unless the state can show that "substantial reason[s]" exist for the discrimination and that "the degree of discrimination bears a close relation to them." Id. at 222. "As part of any justification offered for the discriminatory law, nonresidents must somehow be shown to 'constitute a peculiar source of the evil at which the statute is aimed.'" Id. (quoting Toomer, 334 U.S. at 398).

Cohen's Privileges and Immunities claim is based on a purported violation of her right to travel. It is undisputed that the right to travel is a fundamental right protected by the Privileges and Immunities Clause. See, e.g., Saenz v. Roe, 526 U.S. 489, 501 (1999). "A state law implicates the right to travel when it actually deters such travel, . . . when impeding travel is its primary objective, . . . or when it uses any classification which serves to penalize the exercise of that right." Attorney General of N.Y. v. Soto-Lopez, 476 U.S. 898, 903 (1986) (internal citations and quotation marks omitted).[12] Cohen

---

[12] In Soto-Lopez the Supreme Court considered the "right to travel" in general, having "not felt impelled to locate this right definitively in any particular

claims that the resident-only discount flunks the third part of this test.

However, the Supreme Court has "always carefully distinguished between bona fide residence requirements, which seek to differentiate between residents and nonresidents, and residence requirements, such as durational, fixed date, and fixed point residence requirements, which treat established residents differently based on the time they migrated into the State." Id. at 903 n.3. Clarifying this distinction, the Supreme Court has held,

> A bona fide residence requirement, appropriately defined and uniformly applied, furthers the substantial state interest in assuring that services provided for its residents are enjoyed only by residents. . . . It does not burden or penalize the constitutional right of interstate travel, for any person is free to move to a State and to establish residence there. A bona fide residence requirement simply requires that the person does establish residence before demanding the services that are restricted to residents.

Martinez v. Bynum, 461 U.S. 321, 328-29 (1983) (emphasis in original); accord Soto-Lopez, 476 U.S. at 903 n.3.

The resident-only discount in this case plainly qualifies as a "bona fide residence requirement" under the Supreme Court's definition. As such, because all members

constitutional provision." Attorney General of N.Y. v. Soto-Lopez, 476 U.S. 898, 902 (1986).

of the Plaintiff class are "free to move to [Rhode Island] and to establish residence there" and take advantage of the resident discount, Plaintiff's right to travel claim under the Privileges and Immunities Clause is foreclosed by Soto-Lopez and Martinez.  See also Kelen, 2007 WL 1418510, at *3, *5 (dismissing right to travel challenge to toll discounts available only to certain residents of Massachusetts); accord Surprenant, 2010 WL 785306, at *7.

Perhaps the analysis would be different if Plaintiff had premised the Privileges and Immunities claim on the right to work and earn a living in Newport.  It is firmly established that a "nonresident's right to pursue a livelihood in a State other than his own" is "a right that is protected by the Privileges and Immunities Clause." Baldwin, 436 U.S. at 386; see also United Bldg., 465 U.S. at 219 ("[T]he pursuit of a common calling is one of the most fundamental of those privileges protected by the Clause. . . . Many, if not most, of our cases expounding the Privileges and Immunities Clause have dealt with this basic and essential activity.") (citing numerous decisions).  However, Plaintiff has not premised the Privileges and Immunities claim on the right to earn a

living, and does not challenge a denial of that right.[13] The only Privileges and Immunities claim before the Court is premised on the right to travel, and it must be rejected for the reasons stated.

C.   Equal Protection

The Equal Protection claim stands on the same "right to travel" footing as the Privileges and Immunities claim and fails for the same reasons.

III. CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is DENIED and Defendant's motion for summary judgment is GRANTED.


IT IS SO ORDERED.


*/s/ William E. Smith*

William E. Smith
United States District Judge
Date:  April 7, 2011

---

[13] Indeed, per Plaintiff's request, the certified class is not the class of nonresidents <u>working</u> in Newport but "<u>all</u> non-Rhode Island residents who paid tolls to cross the Newport/Claiborne Pell Bridge using an E-ZPass, FastLane or other comparable system, and who did not receive the discount given to Rhode Island residents pursuant to the RI E-ZPass Discount Plan."  (Order Granting Mot. for Class Certification) (emphasis added).  There is no telling how many, if any, of the class members actually work in Newport.

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ISABEL S. COHEN, on Behalf of Herself and | : | |
| All Others Similarly Situated, John Doe 1 | : | |
| John Doe 2, Jane Doe 1 and Jane Doe 3 | : | |
| | : | |
| v. | : | C.A. No. 09-153S |
| | : | |
| RHODE ISLAND TURNPIKE AND | : | |
| BRIDGE AUTHORITY | : | |

## JOINT STATEMENT OF UNDISPUTED FACTS

The Parties hereby stipulate to the following facts for the purpose of their cross-motions for summary judgment:

1. Defendant, the Rhode Island Turnpike and Bridge Authority ("RITBA"), is a body corporate and politic governed by R.I. Gen. Laws 1956 § 24-12-1 *et seq.*

2. Plaintiff is a resident of the State of Connecticut who utilized the Newport/Claiborne Pell Bridge ("Newport Pell Bridge") and paid tolls at the non-resident rate for doing so. She crossed the Newport Pell Bridge for many reasons, including to purchase items while in Newport.

3. RITBA presently owns, and is responsible for the maintenance and operation of, among other things, the Newport Pell Bridge and the Mount Hope Bridge and their associated buildings and grounds (the "Bridges"). All of RIBTA's funding comes from tolls charged for crossing the Newport Pell Bridge. The tolls from the Newport Pell Bridge are used to fund the operation and maintenance of the Bridges as well as to satisfy debt service.

4. The Newport Pell Bridge is a four (4) lane structure linking Newport, R.I. and Jamestown, R.I.

5.  The Mount Hope Bridge is a two (2) lane suspension bridge built over the Mount Hope Bay that connects Bristol, R.I. and Portsmouth, R.I. Portsmouth and Newport are both located on Aquidneck Island. The Mount Hope Bridge is located approximately ten (10) miles from the Newport Pell Bridge.

6.  According to RITBA's Ten Year Renewal and Replacement Plan, approved by its Board on September 23, 2009, RIBTA will spend over $47 million on the Mount Hope Bridge.

7.  The $47 million will be paid from tolls collected for crossing the Newport Bridge.

8.  In addition, a portion of the Newport Pell Bridge tolls are used to fund upkeep, insurance, utilities, and maintenance cost for the Mount Hope Bridge.

9.  The Newport Pell Bridge is one of three (3) bridges that drivers may use to access Aquidneck Island where Newport is located.

10. Newport is one Rhode Island's tourist destinations.

11. Out-of-State residents utilize the Newport Pell Bridge in connection with tourism.

12. Out-of-State residents also utilize the Newport Pell Bridge to reach their places of employment in Newport.

13. Travelers crossing the Newport Pell Bridge must pay a toll.

14. Pursuant to statute, the RITBA is empowered to set the amount of the tolls for crossing the Newport Pell Bridge.

15. Prior to January, 2009, travelers had the option of paying the toll on the Newport Pell Bridge either by cash, or by token. Cash payments could be made at the toll gate in the amount of $2.00. Tokens could be purchased at the toll gate at the rate of eleven (11) tokens for $10.00. In addition, tokens could be purchased at certain designated locations at the rate of sixty (60) tokens for $50.00. Rhode Island residents and nonresidents could

purchase tokens at the same price at these locations.

16. RITBA uses all toll revenue for debt service or expenses incurred in the operation and maintenance of the Bridges.

17. In January, 2009, RITBA installed and instituted E-ZPass.

18. E-ZPass is an electronic toll system. Under this system, a driver attaches a small electronic device known as a transponder to his or her car. The transponder is linked to an account in the name of the holder of the transponder. When the driver passes through the toll gates, the transponder is read by a corresponding device connected to the gates. Tolls are automatically charged to the account linked to the transponder.

19. By instituting E-ZPass, RITBA eliminated the use of tokens and developed a pricing structure for use with E-ZPass.

20. RITBA developed the following pricing schedule for single crossings over the Newport Pell Bridge:

| Newport Pell Bridge Toll Schedule | RI transponder | Non-Rhode Island transponder |
|---|---|---|
| RI Resident | $0.83 | $1.75 |
| Non-RI Resident | $1.75 | $1.75 |
| Non-RI Resident making 30+ trips per 30 day period | $0.91 | $1.75 |
| Cash | $2.00 | $2.00 |

21. On September 8, 2009, RITBA altered the pricing schedule for single crossings as follows:

| Newport Pell Bridge Toll Schedule | RI transponder | Non-Rhode Island transponder |
|---|---|---|
| RI Resident | $0.83 | $4.00 |
| Non-RI Resident | $4.00 | $4.00 |
| Non-RI Resident making 26+ trips per 30 day period | $0.91 | $4.00 |
| Cash | $4.00 | $4.00 |

22. On February 15, 2010, RITBA altered the pricing schedule for single crossings as follows:

| Newport Pell Bridge Toll Schedule | RI transponder | Non-Rhode Island transponder |
|---|---|---|
| RI Resident | $0.83 | $4.00 |
| Non-RI Resident | $4.00 | $4.00 |
| Non-RI Resident making 6+ trips per 30 day period | $0.91 | $4.00 |
| Cash | $4.00 | $4.00 |
| Unlimited Crossing | $40.00 every thirty (30) days | Unavailable |

23. On April 28, 2010, this Court entered an Order certifying the class as consisting of "all non-Rhode Island residents who paid tolls to cross the Newport/Claiborne Pell Bridge using an E-ZPass, FastLane or other comparable system, and who did not receive the discount given to Rhode Island residents pursuant to the RI E-ZPass Discount Plan."

PLAINTIFF

/s/ Stephen R. White
Stephen R. White, Esq.
Law Offices of Stephen R. White
200 Centerville Road, Suite One
Warwick, RI 02886
steve@srwesq.com

Timothy J. Burke, Esq.
Stull, Stull & Brody
10940 Wilshire Boulevard, Suite 2300
Los Angeles, CA 90024
service@ssbla.com

Jules Brody, Esq.
Mark Levine, Esq.
Aaron L. Brody, Esq.
Stull, Stull & Brody
6 East 45th Street
New York, NY 10017
ssbny@aol.com
mlevine@ssbny.com
ssbny@aol.com

DEFENDANT

/s/ William E. O'Gara
William E. O'Gara (#4257)
Bernard A. Jackvony (#2302)
Thomas R. Gonnella (#7605)
PANNONE LOPES DEVEREAUX & WEST LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908
wogara@pldwlaw.com
(401) 824-5100
(401) 824-5123 (fax)